UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/18/2020

SCOTT MCCRAIN,

                 Plaintiff,

      v.

METROPOLITAN TRANSPORTATION
AUTHORITY; MICHAEL COAN; JOHN
D'AGOSTINO; JOSEPH ESPOSITO; GARY
HOYSRADT; and CHRISTOPHER
NAHMAN,

                 Defendants.

No. 17-CV-2520 (RA)

OPINION & ORDER

Plaintiff Scott McCrain is a police officer employed by the Metropolitan Transportation Authority (the "MTA"). Plaintiff brings this action against the MTA and individual Defendants Michael Coan, former Chief of the MTA Police Department, John D'Agostino, Deputy Chief of the MTA Police Department, Captain Joseph Esposito, Sergeant Gary Hoysradt, and Sergeant Christopher Nahman. He alleges claims under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL"), as well as claims for First Amendment retaliation under 42 U.S.C. § 1983, a violation of the New York Civil Service Law § 75-b, and conspiracy under 42 U.S.C. § 1985. Now before the Court is Defendants' motion for summary judgment. The motion is granted.

# BACKGROUND[1]

Plaintiff has been employed by the MTA as a police officer since 1998. The conditions of his employment are governed by a collective bargaining agreement (the "CBA"), which includes a grievance and arbitration provision. Each year, like other MTA officers, Plaintiff is assigned to work in a particular district. An officer's district assignment can change annually depending, in part, on the officer's preference. Within each district, there is an independent chain of command. "[T]he specific details of an officer's patrol assignment on their shift are determined for each shift by supervisors depending on the needs of the unit and the region." Dkt. 49, Esposito Decl. ¶ 8.

In 2011, Plaintiff was assigned to District 7, which "includes Metro-North's Brewster station and covers a vast area of Northern Westchester, Rockland, Orange, and Putnam counties and parts of Dutchess County." Pl.'s 56.1 Stmt. ¶ 14. While stationed there, Plaintiff was alleged to have falsified records regarding his response to a call for police assistance. *See id*. ¶ 10; Dkt. 47, Coan Decl. ¶¶ 3-4. As part of a "Waiver of Trial Agreement" involving these allegations, Plaintiff agreed to be transferred out of District 7. *See* Dkt. 54, Witkin Decl., Ex. 19 (Waiver of Trial Agreement).

In 2015, Plaintiff was again assigned to District 7. Several months before his transfer there, Lieutenant Raymond Skopin warned Plaintiff that he was being carefully watched.[2] *See*

---

[1] The following facts are drawn from Defendants' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), Plaintiff's Response to Defendants' Rule 56.1 Statement ("Pl.'s 56.1 Stmt."), and supporting documents filed with the parties' briefs. The facts are undisputed unless otherwise noted. Where disputed, the Court construes those facts in the light most favorable to Plaintiff. *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

[2] The parties agree that Skopin warned Plaintiff, and Defendants do not deny Plaintiff's claim that Skopin said: "So you're coming back to Brewster next bid, be careful. They are watching you. We don't want no trouble." Pl.'s 56.1 Stmt. ¶ 11. The parties disagree, however, as to what Skopin's intention was. Defendants argue that Skopin was warning Plaintiff because of his prior misconduct in District 7, whereas Plaintiff insists that Skopin was concerned that Plaintiff was a union delegate. *See id.*; *see also* Dkt. 48, D'Agostino Decl., Ex. 1.

Pl.'s 56.1 Stmt. ¶ 11.  Upon rejoining District 7 in January 2015, Plaintiff was partnered with

Charles McConville    an officer that Plaintiff had known since the 1990s.  They were assigned

to the night shift, also referred to as the "B Tour," and typically worked three days per week

from 7:00 p.m. to 7:20 a.m.  *See id.* ¶¶ 16-17.  At the time, Defendant Esposito was District 7's

commanding officer and thus "in charge of directing officers where to patrol," which was then

executed by his chain of command.  *Id.* ¶ 14.  Defendant Esposito was also in charge of

"reviewing the officers' hours in connection with payroll expenses and overtime pay claims."

Dkt. 49, Esposito Decl. ¶ 2.  Plaintiff reported directly to Defendant Nahman, the night-shift

supervisor.  *See id.* ¶ 11.  Plaintiff also asserts that Defendant Hoysradt was his supervisor.  *See*

Pl.'s 56.1 Stmt. ¶ 19.

## I.     January 2015: Overtime Dispute

In late January 2015, while reviewing District 7 officers' time sheets, Defendant Esposito

noticed that Plaintiff and McConville had, on three separate occasions, claimed three hours of

overtime for self-initiated activity "stemm[ing] from summonses they issued at Brewster station

near the end of their tours ending at 7:20 a.m."[3]  *See* Pl.'s 56.1 Stmt. ¶¶ 30, 33-34; *see also*

Esposito Decl., Ex. 1 (Pl.'s Time Sheets).  According to Esposito, while the officers had

"discretion whether to issue summonses," "[o]nce a summons is issued there is no urgency nor is

it common practice to immediately deliver summonses and related paperwork to the courts."

Dkt. 49, Esposito Decl. ¶ 15.  As such, Esposito "believed it was improper for Officer McCrain

and Officer McConville to submit time sheets in order to earn additional overtime pay to which

their union contract did not entitle them."  *Id.* ¶ 18.

An MTA police officer can obtain overtime pay in several different ways, including

---

[3] Defendant Esposito reported that this occurred on January 15, 16, and 22.  Plaintiff only disputes that he claimed overtime for issuing a summons on January 15.  *See* Pl.'s 56.1 Stmt. ¶ 34.

accepting shifts on a rest day or holiday, "through writing tickets making arrests, court overtime, and if he was dispatched to a call and asked by his supervisors to work past the end of his shift." Pl.'s 56.1 Stmt. ⁋ 25. Pursuant to the CBA, "[i]n instances where Officers are held over, the overtime shall not be less than three (3) hours in length." Dkt. 54, Witkin Decl., Ex. 2 (CBA) at D000071. Defendants contend that the MTA "distinguishes between overtime accrued in connection with police activity in the course of an officer working their patrol assignment directed or approved by a supervisor and overtime that is self-initiated by an officer without supervisory approval." Pl.'s 56.1 Stmt. ⁋ 26.; *see also id.* ⁋ 32; *see also* Dkt. 54, Witkin Decl., Ex. 18 (Esposito's Dep.) at Tr. 53:24-25, 54:1-4 ("Officers were under the misinformation that they were entitled to th[e] three hours for every incident that caused them to go past the end of their tour."). Plaintiff, on the other hand, disputes that "any such distinction exists," instead "equat[ing] being directed by a supervisor, past the end of a tour, with taking police action at the end of a tour if a transgression is being committed in front of him."[4] Dkt. 54, Witkin Decl., Ex. 2 (CBA) at D000071; *see also* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 79:9-14 ("[P]er the contract, if you go past the end of your tour, if you're not back at your reporting location by the end of your tour, you're entitled to three hours. . . . That's the way it's worded in there, the CBA."). Based on his interpretation of the CBA, Plaintiff thus argues that he and McConville rightfully claimed overtime pay on the three days identified by Defendant Esposito.

Because Defendant Esposito interpreted the CBA not to permit overtime pay for "self-initiated activity," he "told the Sergeants and Lieutenants in District 7 about the need to limit self-initiated overtime, and that the automatic three hours of holdover overtime would not be

---

[4] During his deposition, Plaintiff was asked to identify where the CBA provides for his interpretation that an officer is entitled to overtime pay without supervisory approval. Plaintiff could not identify a specific section or provision of the CBA. *See* Dkt. 54, Witkin Decl., Ex. 1 (Pl.'s Dep.) at Tr. 203:19-25, 204:1-8.

paid for self-initiated overtime." Pl.'s 56.1. Stmt. ¶ 37. He also asked Defendant Nahman to tell Plaintiff and McConville "to stop claiming three hours of self-initiated holdover overtime by immediately processing summonses they issued near the end tours." *Id.* ¶ 38; *see also* Dkt. 49, Esposito Decl. ¶ 20. On January 29, 2015, Defendant Nahman spoke to them, explaining that "there was plenty of overtime so there was no need to engage in such an overtime padding scheme." Dkt. 51, Nahman Decl. ¶ 8. Plaintiff "perceived Nahman's comments as a threat," Pl.'s 56.1 Stmt. ¶ 39, because Nahman said "that he was going to split us up, put us on cold platforms, and check on us if we didn't knock the shit off," Dkt. 54, Witkin Decl., Ex. 1 at Tr. 146:5-8.

The same day that Defendant Nahman spoke to Plaintiff and McConville, they sent a memo to Scott Hall, their union representative, with the subject line: "Accursed [sic] of Creating an Activity Pattern for Overtime Holdovers." Dkt. 48, D'Agostino Decl., Ex. 1 (Pl.'s Jan. 29, 2015 Memorandum). They reported what Defendant Nahman had told them and alleged that "Officer McConville and I are being harassed by members of supervision within Dist #07, and they have created a hostile work environment towards us, with threats and bullying." *Id.* Their memo also mentioned Skopin's warning to Plaintiff that he would be watched in November 2014 prior to his transfer to District 7.

On February 5, Plaintiff and McConville sent a second memo, entitled "Instructions by District #07 Commanding Officer, Capt. Esposito," to Hall. Dkt. 48, D'Agostino Decl., Ex. 1 (Pl.'s Feb. 5, 2015 Memorandum). They wrote:

> On January 31, 2015, District #07 PBA Trustee Officer Hall notified Officer McConville and Officer McCrain, as/per Capt. Esposito, we are to stay away from the Metro North Brewster train station and RR crossing between 0600 and 0700 hours. As/per Officer Hall, when asked why they must stay away from that location, Capt. Esposito could not give a definitive answer and stated "I'M A CAPTAIN." The reason why we must stay away from that location is because, if we witness a pedestrian or a vehicle cross the

crossing with the gates down in front of an incoming train and we take Police action it might incur overtime.

*Id.*[5]  The memo also noted that a "tragic incident" had occurred two days earlier at the railroad crossing from which they were told to stay away, which they "find . . . very disturbing."  *Id.*

Hall encouraged Plaintiff and McConville "to forward [their concerns] to IAB [the Internal Affairs Bureau] [because] [i]t could possibly . . . be a criminal matter."[6]  Dkt. 54, Witkin Decl., Ex. 1 at Tr. 184:16-22, 186:4-8.  Therefore, on February 11, Plaintiff and McConville forwarded their two prior memos to Defendant D'Agostino, the head of IAB.  Dkt. 48, D'Agostino Decl., Ex. 1 (Pl.'s February 11, 2015 Memorandum).  In a brief cover letter, they repeated their concern that they had been "instruct[ed] to stop self-initiated Police work between 0600 and 0700 hours"    something the union had "advised . . . could be criminal"    and said they intended to file an EEOC charge.  *Id.*  Shortly after receiving this, Defendant D'Agostino spoke with Defendant Esposito about the overtime issue and "agreed with Esposito that the CBA did not authorize payment of three hours of overtime for self-initiated activity."  Pl.'s 56.1 Stmt. ¶ 58.

Also on February 11, Plaintiff and McConville e-mailed David Sang, an Equal Employment Opportunity ("EEO") Specialist in the MTA's Department of Diversity and Civil Rights ("DDCR"), to report that they were "experiencing harassment, threatening, and bullying tactics within the workplace from the Supervisors and Command Staff in our Police District."  Dkt. 53, Sang Decl., Ex 3 (Pl.'s February 11, 2015 E-Mail).  Attaching their prior memos, they

---

[5] Plaintiff admits that Defendant Esposito never spoke to him directly about any of this.  *See* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 182:3-6.

[6] The parties dispute why the union referred Plaintiff and McConville to IAB.  Defendants state that the "[u]nion refused to help them," whereas Plaintiff insists that it was because Defendant Esposito would not meet with the union.  Pl.'s 56.1 Stmt. ¶ 52.

said that these "only start to describe what we are experiencing within our work place." *Id.* In response to the e-mail, Sang spoke separately to Plaintiff and McConville. He then determined that the issues they raised "were not EEO-related" because their "complaints did not fall under the 'seven classifications of EEOC.'" Pl.'s 56.1 Stmt. ¶ 67; *see also* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 317:17-21.

On February 13, Defendant Esposito e-mailed all of District 7 to "advise[], when reporting to and working out of the District 7 Substations (Brewster, Croton, Harriman, Poughkeepsie) [officers] are required to call on and off duty. This applies to officers on regular tours as well as overtime." Dkt. 49, Esposito Decl., Ex. 2 (Esposito's Feb. 13, 2015 E-Mail). Esposito added that "[s]trict adherence to this is necessary for officer accountability and safety as well as payroll accuracy." *Id.* The next day, Esposito e-mailed District 7 supervisors to clarify that, "[i]f self-initiated activity or enforcement causes officers to go past the end of their tour, they are not entitled to a 3 hour hold over. They will only be paid for overtime worked. 5, 10, 15, 20, 30 minutes etc." Dkt. 49, Esposito Decl., Ex. 3 (Esposito's Feb. 14, 2015 E-Mail).

On March 27, Defendant Esposito sent a third e-mail about overtime to District 7 supervisors. *See* Dkt. 49, Esposito Decl., Ex. 6 (Esposito's Mar. 27, 2015 E-Mail). First stating "[t]his email supersedes all previous emails on this topic," he wrote that "[s]elf-initiated activity should be encouraged and appreciated," but "[w]ith this said, you should be mindful of activity at or near the end of your tours and manage accordingly." *Id.* Esposito maintained the previously-issued rule: "If self-initiated activity or enforcement causes officers to go past the end of their tour, they are not entitled to a 3 hour hold over." *Id.*

## II.     February 21, 2015: Second Overtime Dispute

On February 21, following the end of their night shift at 7:20 a.m., Plaintiff and McConville were approved to work holdover overtime to observe malfunctioning gates at the

Lakeview Crossing Railroad.  *See* Pl.'s 56.1 Stmt. ¶ 68.  Plaintiff and McConville returned to the

Brewster station around 11:00 a.m.   approximately forty minutes after the approved three-hour

holdover overtime.  Defendant Hoysradt, the supervisor at the time, wrote them up for "fail[ing]

to go off duty at your reporting location at 1020 hours as directed."[7]  Dkt. 50, Hoysradt Decl.,

Ex. 1 (Command Discipline Report).

Defendant Hoystradt claims that he instructed them to go off duty by 10:20 a.m. to avoid

exceeding the permitted three hours of holdover overtime.  *See* Pl.'s 56.1 Stmt. ¶ 69; *see also*

Dkt. 50, Hoysradt Decl. ¶ 3 (stating that he instructed them "to leave the crossing . . . with

enough time to return to their reporting location in Brewster and go off duty at 10:20 a.m., in

order to keep their overtime within the three hour holdover limit").  Lieutenant Skopin supported

Defendant Hoysradt, writing to Defendant Esposito that he "heard Sgt. Hoysradt give those

instructions to the officers."  Dkt. 50, Hoysradt Decl., Ex. 2 (Skopin's Feb. 26, 2015

Memorandum to Esposito).  Plaintiff, however, insists that Defendant Hoysradt "advised them

that the day tour sector car was coming to relieve them and when the sector car arrived, [he was

to] return to Brewster and try to go off duty by 1020 hours."  Pl.'s 56.1 Stmt. ¶ 69.  Plaintiff

nonetheless later admitted that "he had gotten the instructions to go off duty by 1020 hours," but

that he and McConville "felt that they could not leave the crossing because it was dangerous."

Dkt. 50, Hoysradt Decl., Ex. 2.

Following this incident, Plaintiff and McConville sent another memo    entitled,

"Harassment in the workplace because of overtime"    to Defendant D'Agostino.  *See* Dkt. 48,

D'Agostino Decl., Ex. 2 (Pl.'s Feb. 21, 2015 Memorandum).  They detailed the recent overtime

dispute with Defendant Hoysradt, including that Defendant Hoysradt "began to raise his voice in

---

[7] After Plaintiff and McConville appealed this discipline, it was withdrawn.

an aggressive manner" when asking why they had not gone off duty earlier. *Id.* They also defended their conduct on the basis that "[i]n all the years we have been Police Officers, we have never left a broken RR grade crossing unprotected." *Id.* They concluded:

> This treatment is a continuation of workplace harassment that has been going on with us from the supervision within this District over holdover overtime. We can't understand why this is a problem and we continued [sic] to be singled out and intimidated, creating a hostile work environment. We feel if we do any Police related work that incurs overtime we will be harassed, threatened, and go through this unnecessary stress. . . . This is a serious safety matter that we feel should not be scrutinized over one extra hour overtime. Again this is not happening to any other Officers within the District only us and should be addressed.

*Id.*

Several days later, on February 25, Plaintiff and McConville sent another memo to Defendant D'Agostino at IAB regarding the overtime dispute with Defendant Hoysradt. Dkt. 48, D'Agostino Decl., Ex 3 (Pl.'s Feb. 25, 2015 Memorandum). They claimed that Defendant Nahman had recently "insulted, offended, and demeaned" them by "complaining . . . [that they] received four hours overtime" and then "bringing up [Plaintiff's] past in District #07." *Id.* After responding to Defendant Nahman that he had been "in trouble here almost four years ago and did my time for that, I don't know why people just can't let it go," Defendant Nahman commented, "just because a perp goes to Green Haven and does his time doesn't mean he's not a perp when he gets out."[8] *Id.* Plaintiff and McConville concluded the memo by writing: "We want this harassment to stop, I was insulted, offended, and demeaned by a Supervisor in front of other Officers and it's unacceptable. No one should have to experience this and the unnecessary stress Officers and I are experiencing under these conditions. " *Id.*

---

[8] Defendant Nahman does not deny making this comment, but says "it was not a 'threat' but rather a reference to Officer McCrain's lack of credibility in [his] view in light of [McCrain's] prior 2011 discipline." Dkt. 51, Nahman Decl. ¶ 17.

### III.  February 25, 2015: Mount Kisco Incident

On February 25, Plaintiff and McConville were assigned a patrol schedule that required them to inspect seven train stations at set times throughout a twelve-hour shift.  District 7 supervisors had recently started to assign similar inspection schedules to officers.[9]

Pursuant to their February 25 assignment, Plaintiff and McConville were ordered to inspect the Mount Kisco station between 11:25 p.m. and 12:25 a.m.  They, however, failed to do so.  *See* Pl.'s 56.1 Stmt. ¶ 83; Dkt. 48, D'Agostino Decl., Ex. 5 (Nahman's Feb. 26, 2015 Memorandum).  As acknowledged by Plaintiff, he and McConville instead drove 24 miles to the Brewster station office to use the restroom, where they took an hour and fifty-eight minute personal break.  *See* Pl.'s 56.1 Stmt. ¶ 83.  They notified the MTA Communications Unit of this break.  *Id.*

The next day, Defendant Nahman wrote to Defendant Esposito that, "[a]t approximately 2330hrs, I arrived at the Mt. Kisco state for a post inspection.  The officers were not at the station as directed."  Dkt. 48, D'Agostino Decl., Ex. 5.  When Defendant Nahman had asked them where they had been, McConville responded that he "had to use the bathroom.  That's the only bathroom I have to use."  *Id.*  The next day, Plaintiff and McConville wrote separate memos to Defendant Nahman, in which they admitted that they had not inspected the Mount Kisco station

---

[9] Plaintiff contends that he and McConville "were the first ones to be given this type of schedule" and that "[i]t was intended for them as retaliation."  Pl.'s Opp. at 20.; *see also* Pl.'s 56.1 Stmt. ¶ 82 (arguing the schedule was designed "to prevent him from doing his job").  Other than his deposition testimony, however, Plaintiff provides no support for this assertion.  By contrast, Defendants have submitted evidence to establish that this type of inspection schedule was assigned to District 7 officers broadly, not just Plaintiff and McConville.  First, Defendant Esposito states that he "issued a more defined inspection schedule for all officers in District 7 to follow," Dkt. 49, Esposito Decl. ¶ 25, and Defendant Nahman confirms that this schedule was given to all officers, not just Plaintiff, *see* Dkt. 51, Nahman Decl. ¶ 27 ("I gave him the schedule issued by Captain Esposito for District 7, not just for him.").  Second, and more significantly, an e-mail in the record shows that Defendant Esposito told District 7 supervisors on February 20 – five days before the Mount Kisco incident – to assign this inspection schedule to officers "[w]hen our numbers and sectors allow."  Dkt. 49, Esposito Decl., Ex. 4.

in order to take "a personal located in the Brewster Yard Office."[10]  Dkt. 51, Nahman Decl., Ex. 5 (Pl.'s & McConville's Feb. 26, 2015 Memoranda).

Following the Mount Kisco incident, Plaintiff and McConville continued to send memos to Defendant D'Agostino and Sang.  On February 27, Plaintiff and McConville wrote a memo to Defendant D'Agostino entitled "Continued harassment and stress in the workplace."  Dkt. 48, D'Agostino Decl., Ex. 4 (Pl.'s Feb. 27, 2015 Memorandum).  In it, they argued that the inspection schedule given to them on February 25 was unfair because it provided them with no time for breaks and it "creat[ed] a serious safety issue."  *Id.*; *see also* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 222:25, 223:1-12 ("It's wrong to put us on a schedule on the same stations every day. . . . We can't even patrol.").  They also alleged that Defendant "Nahman is acting very vindictive" and "acting out on the threats that he made to Officer McConville and I Officer McCrain back on January 29, 2015."  Dkt. 48, D'Agostino Decl., Ex. 4.  On February 28, Plaintiff e-mailed his recent memos to both Sang and Defendant D'Agostino with the subject line "Harassment in the workplace, will not stop and is getting worse" in order to show them "the latest problems/harassment within District #07."  Dkt. 53, Sang Decl., Ex. 6 (Pl.'s February 28, 2015 E-Mail).

On March 20, Plaintiff was disciplined for the Mount Kisco incident for "fail[ing] to report to and complete this assigned Directed Patrol at the Mount Kisco train Station."  Dkt. 51, Nahman Decl., Ex. 7 (Command Discipline Report).  That same day, Plaintiff and McConville sent another e-mail to Sang and Hall, stating that he and McConville are incurring "direct retaliation from the memos [they] wrote when asking for help because of bulling [sic],

---

[10] Plaintiff claims that he and McConville wrote only one memo to Defendant Nahman.  *See* Pl.'s 56.1 Stmt. ¶ 85.  But the record is clear that Plaintiff and McConville submitted two separate memos on February 26.  *See* Dkt. 51, Nahman Decl., Ex. 5.

harassment, and hostile workplace that supervision created in District 7 towards us." Dkt. 53, Sang Decl., Ex. 7 (Pl.'s March 20, 2015 E-Mail).

Plaintiff appealed his discipline for the Mount Kisco incident   pursuant to the CBA first to the MTA Labor Relations and then in arbitration.  In July 2015, the MTA Labor Relations denied his appeal, determining that "[t]here is no dispute that Officer McCrain failed to report his assignment at Mt. Kisco on February 25, 2015" and his "explanation regarding his absence is neither credible nor excuses his failure to report to his assigned location." Dkt. 54, Witkin Decl., Ex. 3  (MTA Labor Relations' Decision).  Describing Plaintiff's conduct as a "serious violation" that "creat[ed] a serious safety issue," the MTA Labor Relations further explained:

> Officer McCrain's hour-long break and 24-mile drive in search of a suitable bathroom is unreasonable by any standard.  His contention that the inability to secure his equipment at a public bathroom and a medical condition   for which he has never requested a reasonable accommodation   required him to use a bathroom located 24 miles from his previous location is implausible.

*Id.*[11]

## IV.    Plaintiff's Disability Complaint

After Plaintiff's February 2015 communications with Sang, Sang told him that his complaint "did not have an EEO basis" because it "did not fall under the 'seven classifications of EEOC.'"  Pl.'s 56.1 Stmt. ¶ 67; Dkt. 53, Sang Decl. ¶¶ 12, 17, 19.  Sang informed Plaintiff "what EEO means including an explanation of protected characteristics under the law," *id.*, at which point Plaintiff "acknowledged that he and McConville were not being singled out because of their race, sex, disability, or any characteristic protected by the MTA policy or law," Dkt. 53, Sang Decl. ¶ 16.

At some point after their conversation, Plaintiff began to research what conduct fell

---

[11] The MTA Labor Relations reached the same conclusion as to McConville's appeal.  *See* Dkt. 54, Witkin Decl., Ex. 6.

within the EEO scope and learned that "[t]he ADA falls in there." Dkt. 54, Witkin Decl., Ex. 1 at Tr. 318:7-9. Plaintiff e-mailed himself a flyer from "Crohn's & Colitis Foundation of America" on March 28. *See* Dkt. 54, Witkin Decl., Ex. 4 (Pl.'s March 28, 2015 E-Mail).

On April 1, Plaintiff e-mailed Sang with the subject line "Restroom Breaks." Dkt. 53, Sang Decl., Ex. 9 (Pl.'s Apr. 1, 2015 E-Mail). Plaintiff first reported that "things continue to worsen within the District" because "Officer McConville and I have to follow a strict station inspection schedule with no meal break or personals, we are on the road for over 10 hours following the schedule that was made for us by Sgt. Nahman and Capt. Esposito." *Id.* He then explained that he had not been aware before that he qualified under the ADA with a disability, but that he "ha[s] a medical condition that is documented with the MTA Medical Department, its Crohn's Disease, and I control it with medication."[12] *Id.* According to Plaintiff, Defendant Nahman, in addition to other co-workers, knew about his Crohn's Disease, and Defendant Nahman was therefore "intentionally preventing [him] from using a restroom while at work." *Id.*

In response to this e-mail, Sang suggested that Plaintiff file a DDCR complaint, which he did on April 20. *See* Dkt. 53, Sang Decl. ¶ 24; Dkt. 53, Sang Decl., Ex. 10 (Pl.'s DDCR Complaint). Shortly thereafter, Plaintiff was notified that his DDCR complaint was received and "ha[d] been accepted for investigation." Dkt. 54, Witkin Decl., Ex 5 (April 23, 2015 E-Mail). On April 14, Sang spoke to Plaintiff, during which Plaintiff claimed that both he and McConville were being discriminated against because of their disabilities — his disability being Crohn's Disease and McConville's being Benign Prostatic Hyperplasia. *See* Dkt. 53, Sang Decl. ¶ 25.

---

[12] Plaintiff provides no evidence to support that his "Crohn's Disease is well documented within the files of the MTA, including the files of its Medical Department." Dkt. 60, Pl.'s Decl. ¶ 26. Defendants, however, do not directly dispute this assertion. Rather, they contend that Plaintiff makes this statement without any personal knowledge and it thus should be inadmissible for that reason. *See* Defs.' Reply at 5 n.6.

Sang "suggested to [Plaintiff] that he contact Human Resources in order to request [an accommodation] so that his schedule could change." Dkt. 53, Sang Decl. ¶ 26.

On June 9, as part of his investigation into Plaintiff's DDCR complaint, Sang interviewed Defendants Esposito and Nahman. The parties dispute whether Defendants Esposito and Nahman were aware of Plaintiff's Crohn's Disease prior to being interviewed by Sang.[13] *See* Pl.'s Rule 56.1 Stmt. ¶ 123. Although Defendant Esposito states that he was unaware of Plaintiff's disability until the interview was scheduled, *see* Pl.'s 56.1 Stmt. ¶ 124, Defendant Nahman acknowledged that he was previously aware of Plaintiff's Crohn's Disease, but insists that he "did not know that Officer McCrain considered it a disability or that it interfered with his work in anyway." Dkt. 51, Nahman Decl. ¶ 27; *see also* Dkt. 53, Sang Decl. ¶ 40.

On September 11, Sang completed his investigation into Plaintiff's complaint that Defendants Esposito and Nahman "subjected him to discrimination based on his disability (i.e., Crohn's disease) by not allowing him to use the restroom, as needed based on his condition, because he has to follow a particular work schedule." Dkt. 53, Sang Decl., Ex. 14 (Final MTA EEO Investigation Report). Sang concluded that "[t]here is **no reasonable cause** to believe that Nahman or Esposito subjected McCrain to discrimination based on his disability." *Id.* He determined that Plaintiff "did not provide any compelling reason why he and his partner could not have used an available facility closer to their patrol assignment" on the day of the Mount Kisco incident and Plaintiff "had not filed a reasonable accommodation request by the time he filed his complaint, nor did he ever express to Nahman or Esposito specifically that the schedule

---

[13] Plaintiff also disputes Defendants Esposito's and Nahman's assertion that they were unaware that Plaintiff filed the DDCR complaint "until shortly before June 9, 2015 when Sang scheduled their interviews." Pl.'s 56.1 Stmt. ¶ 123. Plaintiff alleges in his declaration that they "received notice of my complaint . . . soon after it was filed" in April, but he does not provide a citation to any documentary evidence in the record nor explain how he would have personal knowledge of this.

did not allow him breaks to use the bathroom that he preferred to use based on his condition." *Id.* Plaintiff was notified of this ruling on September 30.

## V.    May 29, 2015: Falsifying Records Incident

Around 4:00 a.m. on May 29, 2015, Lieutenant Christopher Rockett, a member of IAB, stopped at the Brewster station.[14]  There, "he found the office door blocked, the shades drawn, and the lights off."[15]  Pl.'s 56.1 Stmt. ¶ 109; *see also* Dkt. 52, Rockett Decl., Ex. 1 (Investigating Officer's Reports).  Inside, Rockett found Plaintiff and McConville, who said they were "on meal."  Dkt. 52, Rockett Decl., Ex. 1.

Rockett subsequently investigated what Plaintiff and McConville were doing at the Brewster station that evening.  He obtained their memo books and requested access to video or swipe card information for the Brewster station around that time.  Based on the information obtained, Rockett determined that Plaintiff had made false entries in his memo book on May 15 and May 28, 2015.  *See id.*

Several months later, Plaintiff was disciplined for make these false entries.  *See* Dkt. 52, Rockett Decl., Ex. 2 (Aug. 4, 2015 Notice of Intent to Discipline).  Plaintiff appealed.  In December 2015, the MTA Labor Relations upheld his discipline.  Citing the existence of GPS records and Plaintiff's own admission that he made these incorrect entries, it concluded that

---

[14] Plaintiff says he "lacks knowledge and/or information" as to why Rockett was traveling by the Brewster substation, but then also alleges that "[i]t appeared that [Defendant] D'Agostino was retaliat[ing] against plaintiff by sending Internal Affairs members to check up on him."  Pl.'s 56.1 Stmt. ¶¶ 107-09.  Rockett denies this.  *See* Dkt. 52, Rockett Decl. ¶ 4 ("I was not sent to Brewster by Chief D'Agostino or anyone else.").  Plaintiff has provided nothing to support his assertion that Rockett was following Plaintiff or that others directed him to visit the Brewster station.

[15] Plaintiff claims to dispute Rockett's description of how he found the Brewster station that morning.  Yet, Plaintiff only counters that "[t]he ceiling lights above the computer were off while plaintiff was using the computer" and "[o]ther lights were on."  Pl.'s 56.1 Stmt. ¶ 109.  Moreover, during his deposition, Plaintiff admitted that "Rockett came to the station, found the shades drawn, and thought [Plaintiff] w[as] sleeping."  Dkt. 54, Witkin Decl., Ex. 1 at Tr. 258:10-13.

"[t]here is no dispute that Officer McCrain failed to report to his assignments at Southeast Station on May 15, 2015 and May 29, 2015."[16]  Dkt. 54, Witkin Decl., Ex. 7 (Dec. 17, 2015 MTA Labor Relations' Decision).

## VI.    Arbitration Proceedings

On June 15, 2016, an arbitration hearing    the final level of appeal under the CBA    was held regarding Plaintiff's discipline for both the Mount Kisco and Falsifying Records incidents. On June 29, an arbitration award and opinion was issued, denying Plaintiff's appeal as to both disciplines.  *See* Dkt. 54, Witkin Decl., Ex. 9 (Arbitration Opinion & Award).  As to the Mount Kisco incident, the arbitrator explained that while "somewhat sympathetic to the grievant and to his health concerns, nevertheless some of his actions here with respect to utilization of bathroom breaks at distant facilities were misguided," primarily because "driving some twenty-four miles to use a restroom . . . was improper."  *Id.*  He also noted that Plaintiff's explanation for falsifying records in his memo book    "fear of being written up"    "is certainly not an adequate reason." *Id.*  The arbitrator thus upheld Plaintiff's discipline, suspending him for thirty days.[17]  He also ordered that Plaintiff "be transferred by the Chief to a District from which his health problem may be more adequately accommodated."  *Id*.

## VII.   Requests for Accommodation

In January 2016, Plaintiff was transferred to his preferred assignment, District 5, which covers Grand Central Terminal.  After the arbitration decision in July 2016, however, Plaintiff was transferred to District 4, covering Penn Station, and assigned to work the daytime shift.  The union filed a grievance on Plaintiff's behalf protesting the transfer to District 4 because "his

---

[16] The MTA Labor Relations reached the same conclusion as to McConville's appeal.  *See* Dkt. 54, Witkin Decl., Ex. 8.

[17] Several days later, the arbitrator modified Plaintiff's suspension to twenty days without pay.  *See* Dkt. 54, Witkin Decl., Ex. 10 (July 12, 2016 E-Mail from Arbitrator Modifying the Award).

health problem was being adequately accommodated" in District 5.  Dkt. 54, Witkin Decl., Ex. 16 (Aug. 18, 2016 Grievance Form).

On November 21, 2016, Plaintiff filed a formal reasonable accommodation request, asking for a transfer back to District 5 on the night shift.  *See* Dkt. 54, Witkin Decl., Ex. 11 (Pl.'s Nov. 21, 2016 Reasonable Accommodation Request).  He claimed that the transfer to District 4 "did not accommodate my health disability in any way and only worsened my symptoms" because working in District 4 "added over three hours and four subway train rides to my daily community" and "[b]etween the extremely long commute, changing my circadian rhythm, lack of sleep, and unnecessary stress to my body, my condition has worsened." *Id.*  He further added that District 5 would better accommodate his health issues because it has "more restrooms throughout the terminal." *Id.*

On January 9, 2017, Plaintiff's transfer request to District 5 was granted, but his request to be assigned to the night shift was denied because it "was not supported by the medical documentation provided." *See* Dkt. 54, Witkin Decl., Ex. 14.  Plaintiff then grieved the denial of his transfer to the night shift.  Defendant MTA and Plaintiff eventually resolved this dispute via settlement, with the MTA allowing him to work the night shift and giving him "a single, lump-sum payment . . . in the amount of four hundred ($400.00) in full satisfaction for the alleged night differential he was owed" in exchange for his withdrawal of this grievance with prejudice. Dkt. 54, Witkin Decl., Ex. 15.

## VIII.  Procedural Background

Plaintiff filed a notice of claim in May 2015, *see* Dkt. 60, Ex. B, and two supplemental notices of claim in July and September 2015, *see* Dkt. 60, Ex. C, D.  On October 28, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC").  *See* Dkt. 60, Ex. E.

On April 7, 2017, Plaintiff filed this action. Defendants filed a joint answer on July 20,

2017. During the course of discovery, the parties stipulated to the dismissal with prejudice of (1)

all claims against Lieutenant Raymond Skopin, (2) the equal protection claims against the

remaining Defendants; (3) the New York Civil Service Law § 75-b claim against the individual

Defendants; and (4) the punitive damage claim against Defendant MTA. *See* Dkt. 41. After the

parties completed discovery, Defendants filed the present motion for summary judgment, which

Plaintiff opposed.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the

movant establishes that "there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.

2008). A fact is "material" if it "might affect the outcome of the suit under the governing law,"

and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court

must "construe the facts in the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011).

## DISCUSSION

### I.    Evidentiary Issues

As an initial matter, Defendants raise two evidentiary issues regarding Plaintiff's

declaration filed with his opposition, *see* Dkt. 60, and Rule 56.1 Statement. *See* Defs.' Reply at

3-6. They contend that the Court should disregard Plaintiff's declaration because "Plaintiff

offers only his own inadmissible declaration of unsubstantiated, self-serving statements with no

foundation as to how he knows the facts he asserts to the Court." *Id.* 3 (describing the declaration as "comprised of hearsay and conclusory assertions to fabricate issues of fact"). Defendants also ask the Court to disregard Plaintiff's "Additional Facts" section of his Rule 56.1 Statement, *see* Pl.'s 56.1 Stmt. ¶¶ 174-222, because his statements there are also "based almost exclusively on Plaintiff's inadmissible declaration or distortion of the record." Defs.' Reply at 5-6.

Rule 56(c) permits the submission of "[a]n affidavit or declaration used to support or oppose a motion" so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c). "A court may therefore strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 193, 198 (2d Cir. 1999); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 131 n.12 (2d Cir. 2004) (affirming that "the district court was free to disregard . . . [s]ome of the affidavits [which] contain hearsay statements and speculation"). Furthermore, "[a] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

The Court will not disregard the entirety of Plaintiff's declaration. Defendants are nonetheless correct that Plaintiff's declaration includes assertions made without personal knowledge. *See, e.g.*, Dkt. 60, Pl.'s Decl. ¶¶ 9-13, 50, 82. "Merely being 'aware' of purported facts is a far cry from having . . . personal knowledge." *Payne v. Huntington Union Free Sch. Dist.*, 219 F. Supp. 2d 273, 279 (E.D.N.Y. 2002). In addition, throughout much of his

"Additional Facts" section, Plaintiff primarily cites only to his own declaration for support. *See Simmons v. Woodycrest Ctr. for Human Dev.*, No. 10-CV-5193 (JSR), 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (describing the plaintiff's Rule 56.1 Statement as "materially deficient" because "[i]t does not cite to record evidence to support any of its contentions, and several of its 'facts' are, in actuality, legal conclusions"). As such, in analyzing Defendants' motion for summary judgment below, the Court will consider only those statements that Plaintiff "made on personal knowledge," "would be admissible in evidence," and "show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(c).

## II. First Amendment Retaliation

Plaintiff first argues that his memos and emails sent to Defendant D'Agostino, Sang, and Hall in January and February 2015 were constitutionally protected speech for which he was unlawfully disciplined. In *Garcetti v. Ceballos*, the Supreme Court held that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." 547 U.S. 410, 417 (2006). "[T]his test contains two separate requirements namely, (1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern." *Brady v. County of Suffolk*, 657 F. Supp. 2d 331, 342 (E.D.N.Y. 2009). Without satisfying both of these requirements, a First Amendment retaliation claim cannot succeed. *See id.*

Defendants are entitled to summary judgment as to Plaintiff's First Amendment retaliation claim because there is no factual dispute bearing on whether his memos and e-mails touch on a matter of public concern. "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Ruotolo v. City of New York*,

514 F.3d 184, 189 (2d Cir. 2008). "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" *Id.* (quoting *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999)). "An employee who complains solely about his own dissatisfaction with the conditions of his own employment" is not speaking about matters of public concern. *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009).

The gravamen of Plaintiff's memos was to seek assistance with the alleged harassment directed towards him and McConville by his District 7 supervisors. Both his January 29 and February 5 memos focused solely on Defendants Esposito's and Nahman's conduct after the overtime dispute. For instance, on January 29, Plaintiff wrote, "I feel Officer McConville and I are being harassed by members of Supervision within Dist. #07, and they have created a hostile work environment towards us, with threats and bullying tactics." Dkt. 48, D'Agostino Decl., Ex. 1. Plaintiff's February 5 memo concerned the fact that "District #07 PBA Trustee Officer Hall notified Officer McConville and I Officer McCrain, as/per Capt. Esposito we are to stay away from the Metro North Brewster train station and RR crossing between 0600 and 0700 hours" because if "we take Police action it might incur overtime." *Id.* Significantly, the February 5 memo suggests that this instruction was given only to him and McConville, not to District 7 officers generally.

Similarly, Plaintiff's February 21 and February 25 memos to Defendant D'Agostino also focused on District 7 supervisors' conduct towards Plaintiff and McConville specifically, not District 7 officers more generally. *See* Dkt. 48, D'Agostino Decl., Ex. 2, 3. In the February 21 memo, Plaintiff described in detail his overtime dispute with Defendant Hoysradt, alleging that "[t]his treatment is a continuation of the workplace harassment that has been going on with us from the supervision within this District over holdover overtime." Dkt. 48, D'Agostino Decl.,

Ex. 2.  Then in the February 25 memo, Plaintiff reported that he "was insulted, offended, and demeaned"    this time because of Defendant Nahman's comment referring to Plaintiff as "a perp."  Dkt. 48, D'Agostino Decl., Ex. 3.  Furthermore, in Plaintiff's first e-mail to Sang on February 11, he explained that he was contacting him because "[m]y partner Officer McConville and I are experiencing harassment, threatening, and bullying tactics within the work place from the Supervisors and Command Staff in our Police District."  Dkt. 53, Sang Decl., Ex. 3.

Plaintiff's e-mails and memos thus pertained to "an issue that is 'personal in nature and generally related to [Plaintiff's] own situation.'"  *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (explaining that, generally speaking, issues regarding a speaker's "assignments, promotion, or salary" are "personal in nature").  Despite Plaintiff's contention, his memos and e-mails did not touch on a topic "'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech."  *Id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004)) (considering whether the speech was at all related to "any matter of political, social, or other concern to the community").  Rather, his communications were "reactive, made only in response to discipline or threatened discipline"    indicative of the personal nature of Plaintiff's speech at issue.  *Brady*, 657 F. Supp. 2d at 344.

Plaintiff nonetheless attempts to frame these documents as relevant to a matter of public concern.  He emphasizes, for instance, that several of his memos refer to a "tragic incident" that occurred at a railroad crossing within District 7 in early February 2015.  In turn, Plaintiff attempts to connect that accident to Defendant Esposito's "instruction to stop self-initiated Police work":

> On February 03, 2015 a tragic incident occurred involving a train striking a vehicle . . . in our sector.  Yet our Commanding Officer, Capt. Esposito is ordering us to stay away from all RR crossings within our sector between 0600 and 0700 hours, the height of the morning rush hour.  We find this very disturbing.

Dkt. 48, D'Agostino Decl., Ex. 1. But the fact that several of Plaintiff's memos refer to a railroad accident cannot alone transform his communications into an issue of public concern. As the Second Circuit has held, "retaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern.'" *Ruotolo*, 514 F.3d at 190 (quoting *Ezekwo v. N.Y.C. Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)).

Rather, the Court is required to review "the whole record." *Ruotolo*, 514 F.3d at 189. Here, that analysis leaves the Court no doubt that the purpose of Plaintiff's communications was to notify and seek assistance from Defendant D'Agostino, Sang, and Hall with respect to his personal grievances with his District 7 supervisors. "[A]ll of these undisputed facts paint a clear picture of an employee speaking out about his views regarding how best to perform his job duties, rather than of someone attempting to make a 'contribution[] to the civic discourse.'" *Brady*, 657 F. Supp. 2d at 346. Accordingly, summary judgment as to Plaintiff's First Amendment retaliation claim is granted to Defendants.

## III.    ADA

Plaintiff alleges that Defendant MTA discriminated against him because of his Crohn's Disease.[18] He brings four independent claims under the ADA: (1) disability discrimination; (2) retaliation; (3) hostile work environment; and (4) reasonable accommodation. The Court

---

[18] Plaintiff only brings his ADA claims against Defendant MTA. It is widely held by courts in this circuit that the ADA does not provide for individual liability. *See Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302-03 (S.D.N.Y. 2016) ("[T]here is no individual liability under the ADA."); *see also Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) (holding that, "in the context of employment discrimination, the retaliation provision of the ADA . . . cannot provide for individual liability").

considers each argument in turn.

## A. Disability Discrimination

Plaintiff suffers from Crohn's Disease, requiring him to frequently use a bathroom. He contends that he was subject to harassment, including the discipline from the Mount Kisco and Falsifying Records incidents, because of his Crohn's Disease.[19] Plaintiff states that the inspection schedule assigned to him and McConville on February 25, 2015 "was not neutral," "[n]o one else was placed on such a strict schedule," Pl.'s Opp. at 19-20, and that Defendant Nahman gave him the schedule because "[he] knows I have Crohn's. He's preventing us from taking my breaks or meals. And when we do take a break, such as the personal, he wrote us up," Dkt. 54, Witkin Decl., Ex. 1 at Tr. 310:9-14. In that same vein, he contends the discipline resulting from failing to inspect the Mount Kisco station was discriminatory because he needed to use the restroom due to his Crohn's Disease. *See* Pl.'s Opp. at 19-20. He also contends that the discipline from the Falsifying Records incident was discriminatory.

"Disability discrimination claims brought under the ADA are subject to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Wagner v. Inter-Con Sec. Sys., Inc.*, 278 F. Supp. 3d 728, 734 (S.D.N.Y. 2017). To prevail on a disability discrimination claim under the ADA, Plaintiff must establish that "(1) [his] employer is subject to the ADA; (2) [he] was disabled within the meaning of the ADA; (3) [he] was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) [he] suffered [an] adverse employment

---

[19] Plaintiff states "that his discrimination case goes beyond the fact that defendants punished him for using the restroom and involved the directed patrol schedule that left him no time to use the restroom and which led to his being disciplined." Pl.'s Opp. at 19. However, he does not then identify any potential adverse actions, beyond the Mount Kisco and Falsifying Records incidents, and the Court – in its independent review of the record – has not identified any.

action because of h[is] disability." *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004).

Plaintiff must also establish that his disability was the but-for cause of the adverse employment

action. *See Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019) ("We conclude that

'on the basis of' in the ADA requires a but-for causation standard.").

 Even if Plaintiff were able to demonstrate these elements, Defendant MTA could rebut

the presumption of unlawfulness by "offer[ing] through the introduction of admissible evidence a

non-discriminatory reason for [its] actions that, if believed by the trier of fact, would support a

finding that unlawful discrimination was not a cause of the disputed employment

action." *Heyman v. Queens Vill. Cmty. for Mental Health for Jamaica Cmty. Adolescents*, 198

F.3d 68, 72 (2d Cir. 1999). At that point, "Plaintiff then must show that the proffered reason was

merely a pretext for discrimination." *Id.* "Summary judgment is appropriate . . . only if the

employer's nondiscriminatory reason is dispositive and forecloses any issue of material

fact." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir. 2000).

 As an initial matter, the Court agrees with Plaintiff that there exists a factual dispute as to

whether Plaintiff's supervisors were aware that he had Crohn's Disease prior to the Mount Kisco

incident on February 25, 2015. This is critical because there must be, at a minimum, an issue of

fact as to whether an employer had knowledge of a disability to be held liable. *See Vomar v.

Cold Spring Hills Ctr. for Nursing & Rehab.*, 395 F. App'x 795, 796 (2d Cir. 2010) (citing

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) (explaining that if an employer "were

truly unaware that such a disability existed, it would be impossible for [its] [employment]

decision to have been based, even in part, on respondent's disability")). Because Plaintiff did not

file a complaint mentioning his disability until April 1, 2015, Defendant MTA contends that

"Plaintiff was issued his schedule and suffered his Mount Kisco Discipline *before* his supervisors

were aware of his alleged disability." Defs.' Mot. at 26. The record, however, reflects at least a dispute of fact as to whether Defendant Nahman knew Plaintiff had Crohn's Disease before Plaintiff's transfer to District 7 in 2015. *See* Dkt. 53, Sang Decl. ¶ 40 ("When I interviewed Nahman on June 9, 2015, he told me that he was aware that McCrain had Crohn's Disease but did not know that his Crohn's Disease affected his work or that McCrain believed that his assignment did not allow him to use the restroom."). As such, this is not a grounds on which the Court will grant Defendant MTA summary judgment.

Nevertheless, even assuming that Plaintiff could make a *prima facie* case of disability discrimination, his claim still fails as there is no dispute of fact that District 7 supervisors' conduct towards him and his resulting discipline were legitimate and non-pretextual. Turning first to the Mount Kisco incident, Plaintiff contends that the inspection schedule assigned to him "was not neutral," but assigned to him because of his disability. Pl.'s Opp. at 19-20. But Defendant MTA has established — and Plaintiff offers no contrary evidence — that Defendant Esposito, District 7's commanding officer at the time, ordered this schedule to be assigned to all available officers. *See* Pl.'s 56.1 Stmt. ¶ 79. Just five days prior to the Mount Kisco incident, Defendant Esposito e-mailed District 7 supervisors, including Defendant Nahman, asking them to "follow the schedule below," which laid out ten stations to be inspected at specific times, "[w]hen our numbers and sectors allow." *See* Dkt. 49, Esposito Decl., Ex. 4. Defendant Nahman affirmed this, stating that he "gave [Plaintiff] the schedule issued by Captain Esposito for District 7, not just for [Plaintiff]." Dkt. 51, Nahman Decl. ¶ 27. "The application of neutral company policies" — such as this inspection schedule — "is 'by definition' a legitimate, non-discriminatory reason for a particular action." *Marinacci v. U.S. Postal Serv.*, 403 F. Supp.3d 116, 127 (E.D.N.Y. 2017).

Plaintiff only disputes this documentary evidence by citing his deposition testimony asserting that he and McConville were the first to receive this schedule and that their inspection schedule was stricter than others' schedules. *See* Pl.'s 56.1 Stmt. ¶¶ 79, 81-82; *see also* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 188:3-25, 189:3-10. Moreover, Plaintiff's own memo, which he sent to Defendant D'Agostino two days after the Mount Kisco incident, suggests that other officers were also assigned this inspection schedule. In that memo, he wrote, "Sgt. Nahman started assigning station checks to Officers in District #07 throughout their shifts." Dkt. 48, D'Agostino Decl., Ex. 4. The memo said nothing about whether Plaintiff had been singled out to receive this inspection schedule. Particularly in light of Defendant Esposito's February 20 e-mail, Plaintiff fails to "put forth evidence sufficient" to rebut Defendant MTA's legitimate, non-discriminatory reason for giving Plaintiff a neutral inspection schedule. *Holt*, 95 F.3d at 134.

There is also no dispute that Plaintiff was disciplined for the Mount Kisco incident for legitimate, non-discriminatory reasons. Plaintiff acknowledges that when he was assigned this inspection schedule, neither he nor McConville raised the issue of Crohn's Disease with any of the individual Defendants. *See* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 311:12-14; *see also id.* at Tr. 247:24-25 (stating that he never told Defendant Nahman "that it was an impossible schedule for [him] to satisfy"). Even more significantly, Plaintiff has repeatedly admitted that he failed to inspect the Mount Kisco station as he was assigned to do. Prior to filing this action, Plaintiff acknowledged as much to the arbitrator. As noted in the arbitral decision, "the grievant testified that he did not report to the station he was to report to as directed, since he had to find a suitable restroom and that was the reason for his action." Dkt. 54, Witkin Decl., Ex. 9. Noting that taking a personal break itself was not the issue, the arbitrator found Plaintiff's decision to "drive some twenty-four miles to use a restroom, which the grievant preferred to use, rather than one

that was closer . . . improper." *Id.* During discovery in this action, Plaintiff again admitted that he failed to inspect the Mount Kisco inspection for which he was disciplined. *See* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 248:20-25. As such, even by Plaintiff's own admissions, Defendant MTA had a legitimate, non-discriminatory reason to discipline Plaintiff because he disregarded his assignment to inspect the Mount Kisco station that evening.

Plaintiff's only specific rebuttal to this is that it was "routine practice to return to the base facility to use the restroom." Pl.'s 56.1 Stmt. ¶ 83. Plaintiff, however, does not point to any evidence in the record reflecting that this "routine practice" existed. And even if it was a routine practice, that would not negate the fact that Plaintiff failed to comply with his supervisor's order to inspect a particular station at a set time, thus giving Defendant MTA a valid ground to discipline him. Plaintiff's opposition also fails to identify any reason for the Court to find Defendant MTA's explanation for this discipline to be pretextual.

This analysis applies equally to the discipline that Plaintiff received for the Falsifying Records incident. Plaintiff admitted that he made false entries in his memo book, for which he was disciplined, because he was "fear[ful] of being written up" when he did not perform his job functions. Dkt. 54, Witkin Decl., Ex. 9. He again fails to point to anything in the record that suggests this discipline served as mere pretext for discriminating against him because of his Crohn's Disease.

In sum, Defendant MTA has proffered sufficient evidence that assigning Plaintiff the inspection schedule on February 25 and then disciplining him for failing to comply with his job responsibilities was not because of his Crohn's Disease. Yet, Plaintiff offers nothing to "show that the proffered reason was merely a pretext for discrimination." *Heyman*, 198 F.3d at 72. Because the record forecloses any issue of material fact as to Plaintiff's disability discrimination

claim, summary judgment in Defendant MTA's favor is appropriate.

## B. Retaliation

Plaintiff next contends that Defendant MTA retaliated against him for complaints he made about alleged disability discrimination by disciplining him for the Mount Kisco and Falsifying Records incidents.[20]  The same *McDonnell* burden-shifting framework discussed above applies in the ADA retaliation context.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  A retaliation claim requires showing that "(1) [Plaintiff] engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Id.*  Plaintiff must also "show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent."  *Id.*  The burden then shifts to Defendant MTA to "articulate a legitimate, non-retaliatory reason for the challenged employment decision," in which case "[P]laintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Id.* at 721.

Here, the initial question is what constituted Plaintiff's protected activity.  "'Protected activity' is 'action taken to protest or oppose statutorily prohibited discrimination.'"  *Natofsky*, 921 F.3d at 354 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  Defendants do not dispute that Plaintiff's disability complaints to Sang on April 1 and April 15 were protected activity.  *See* Dkt. 53, Sang Decl. ¶¶ 23, 26-27.  But Plaintiff contends that his protected activity was not so limited because it "also include[d] plaintiff's continued

---

[20] Plaintiff appears to argue that his retaliation claim "goes far beyond" these two disciplinary incidents. Pl.'s Opp. at 25 ("There are a host of actions which plaintiff contends were retaliatory; not only the cited disciplines.").  Plaintiff, however, has failed to demonstrate – or even articulate – what other adverse employment actions on which his retaliation claim could be predicated.

communications with Sang[,] plaintiff's notices of claim, plaintiff's complaint to the EEOC, his 2014 complaint to Sang and his reasonable accommodation requests." Pl.'s Opp. at 25-26.

The Court agrees with Defendants that the relevant protected activity for analyzing Plaintiff's retaliation claim are the two April 2015 disability complaints to Sang. The other actions either do not constitute protected activity or took place after the relevant adverse employment actions, thus prohibiting any causal finding. First, Plaintiff's communications with Sang prior to those April complaints did not constitute protected activity because they never mentioned a disability, instead focusing on Plaintiff's overtime dispute with his District 7 supervisors. *See* Pl.'s 56.1 Stmt. ¶ 66; *see also Natofsky*, 921 F.3d at 354 (holding that it is not protected activity when the plaintiff was "not protesting discrimination in his appeal but offering a defense of why he may have been slow in responding to emails"). As Sang has stated, "[d]uring our February 20 call McCrain acknowledged that he and McConville were not being singled out because of their race, sex, disability or any characteristic protected by the MTA EO Policy or law." Dkt. 53, Sang Decl. ¶ 16. Second, while Plaintiff's notices of claim and EEOC complaint—all filed between May and September 2015—constitute protected activity, as Defendant MTA concedes, *see* Defs.' Reply at 14 n.17, Plaintiff has not asserted that he suffered any adverse employment action *after* filing those documents. *See* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 338:17-24 (stating that he has not been written up since the Falsifying Records incident). Assuming that Plaintiff's reasonable accommodation requests in 2015 and 2016 constitute protected activity, the same would be true of those. The Court, therefore, focuses its analysis on whether Plaintiff was retaliated against as a result of his disability complaints in April 2015.

As to the Mount Kisco incident, the Court quickly dismisses this as a basis for Plaintiff's retaliation claim. Plaintiff failed to inspect the Mount Kisco station on February 25, 2015 and

was disciplined for that on March 20, 2015. *See* Pl.'s 56.1 Stmt. ⁋⁋ 83, 87; Dkt. 49, Esposito Decl., Ex. 5. Plaintiff did not file a disability complaint until April 1 approximately two weeks after he was disciplined. In *Natofsky v. City of New York*, the Second Circuit explained that an alleged adverse employment action taking place prior to the protected activity cannot constitute retaliation. *See* 921 F.3d at 354. This Court has similarly held that the ADA's retaliation "causation standard necessarily means that any of [the plaintiff's] alleged protected activities must have occurred before the purportedly adverse actions[.]" *Salas v. N.Y.C. Dept' of Investigation*, 298 F. Supp. 3d 676, 686 (S.D.N.Y. 2018). As such, Plaintiff's discipline for the Mount Kisco incident could not have been the result of his protected activity.

With regard to the Falsifying Records incident, which took place after Plaintiff's protected activity, this too fails albeit for another reason. Defendants have "articulate[d] a legitimate, non-retaliatory reason for the challenged employment decision," which Plaintiff has not rebutted. *Treglia*, 313 F.3d at 721. The record is clear that after finding Plaintiff and McConville at the Brewster station on May 29, 2015, Rockett investigated them and determined they had committed "numerous additional acts of misconduct," including making false entries in his memo book on at least two occasions. *See* Dkt. 52, Rocket Decl., Ex. 2. Indeed, Plaintiff has "admitted" to "the falsification of [these] records." Dkt. 54, Witkin Decl., Ex. 9. Defendants, therefore, have established that Plaintiff was disciplined for a legitimate reason unrelated to his disability.

With the burden then shifted back to Plaintiff, he has failed to demonstrate that there is a genuine dispute as to any material fact regarding whether he was disciplined on a pretextual basis. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173 (2d Cir. 2006). First, "there is no evidence that Rockett was ever aware of Plaintiff's DDCR complaint" filed in April 2015.

Defs.' Reply at 14.  While the Second Circuit has held that "general corporate knowledge that the plaintiff has engaged in a protected activity" is sufficient, *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007), this void in the record certainly weakens Plaintiff's claim that he was disciplined as a result of his disability.  Moreover, Plaintiff fails to rebut that his discipline was legitimate. Here, "an intervening causal event . . . occurred between the protected activity and the alleged retaliatory [adverse action]"    that is, Rockett's investigation and subsequent finding that Plaintiff made false and misleading entries in his memo book.  *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005).  Once again, Plaintiff's opposition includes no specific allegations    or even citations to the record    to counter that this was legitimate discipline.  *See* Pl.'s Opp. at 27.  "[A]ttempt[s] to rebut [an] employer's proffered explanations by generally disputing the accuracy of h[is] supervisors' assessments, and providing h[is] own contrary appraisal of h[is] work . . . is insufficient to sustain a reasonable finding that defendant's proffered non-discriminatory reasons for h[is] [discipline] were pretext." *Garrett v. Garden City Hotel, Inc.*, No. 05-CV-962 (JFB), 2007 WL 1174891, at *14 (E.D.N.Y. Apr. 19, 2007).

Accordingly, with no basis for a reasonable trier of fact to conclude that Plaintiff was disciplined as a result of his April 2015 disability complaints, Defendant MTA is also entitled to summary judgment on the ADA retaliation claim.

### C.  Hostile Work Environment

Plaintiff also argues that he was subject to a hostile work environment in violation of the ADA.[21]  "A hostile work environment claim requires a showing (1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

---

[21] Although the Second Circuit has not yet decided whether a hostile work environment claim is cognizable under the ADA, courts in this district – including this Court – have assumed that it is and that Title VII's standard applies.  *See Salas*, 298 F. Supp. 3d at 683.

abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). A court must "look to the record as a whole and assess the totality of the circumstances . . . including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's job performance." *Gorzynski v. JetBlue Airways Corp.*, 596 F. 3d 93, 102 (2d Cir. 2010). This is analyzed both objectively and subjectively. *See Alfano*, 294 F.3d at 373.

The Court grants summary judgment to Defendant MTA for two reasons. First, there is no genuine dispute of material fact that Plaintiff's work environment was not sufficiently severe or pervasive to satisfy the hostile work environment standard.[22] Plaintiff admits that he never received any disability-related remarks. *See* Pl.'s Opp. at 24. He thus relies largely on "[i]solated acts," such as his discipline from the Mount Kisco and Falsifying Records incidents, but these "do not meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 374. This is particularly true here, where the disciplines were given to Plaintiff for non-discriminatory, legitimate reasons, as explained above. And while Plaintiff also seems to assert that he suffered general harassment in January and early February 2015 due to the overtime dispute, that at most included a few comments (unrelated to his purported disability), such as Defendant Nahman's reference to him as a "perp," as well as the direction that he not take holdover overtime without approval. This is not "sufficiently continuous and concerted" harassment that can constitute a hostile work environment. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

---

[22] Notably, Plaintiff offers no specifics as to what conduct he rests his hostile work environment claim. At most, acknowledging that he "does not cite any disability directed remarks," Plaintiff contends that he has alleged "more than 'petty slights and inconveniences.'" Pl.'s Opp. at 24; *see also* Defs.' Reply at 16 ("Plaintiff cites extensive case law but *again* fails to cite to a single fact in the instant case to support that *he* suffered a hostile work environment based on his alleged disability.").

Even assuming *arguendo* that Plaintiff had suffered severe and pervasive harassment, "there is . . . no evidence that any act alleged by Plaintiff was on the basis of his Crohn's [D]isease." Defs.' Memo. at 28. To successfully make a hostile work environment claim, Plaintiff must show that Defendant MTA "create[d] such an environment because of [his] [disability]." *Forgione v. City of New York*, No. 11-CV-5248, 2012 WL 4049832, at *7 (S.D.N.Y. Sept. 13, 2012) (citing *Patane*, 508 F.3d at 113); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (explaining that alleged "intimidation, ridicule, and insult" must be "discriminatory" in nature). "The ADA, of course, does not protect against general harassment." *Holt v. Sams Club*, 579 F. App'x 36, 37 (2d Cir. 2014). As the Second Circuit has explained, "many bosses are harsh, unjust, and rude . . . [i]t is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano*, 294 F.3d at 377. Therefore, even if Plaintiff suffered severe harassment, the ADA does not offer him a basis for relief.[23]

### D. Reasonable Accommodation

Finally, Plaintiff argues that the MTA denied him a reasonable accommodation in violation of the ADA. "[D]isability-based discrimination under the ADA includes failing to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018) (quoting 42 U.S.C. § 12112(b)(5)(A)). A successful claim for discrimination

---

[23] Because the Court finds that Plaintiff cannot satisfy the elements of a hostile work environment claim, the Court need not reach Defendants' alternative argument that the *Faragher/Ellerth* affirmative defense would nonetheless preclude liability. *See* Defs.' Mot. at 30; *see also Gorzynski*, 596 F.3d at 103 (providing the elements for establishing this defense).

based on an employer's failure to accommodate a disability requires establishing that "(1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Natofsky*, 921 F.3d at 352. "In addition, a plaintiff must show 'the *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action.'" *Id.* (quoting *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 108 (2d Cir. 2001).

As an initial matter, the parties dispute when Plaintiff made his reasonable accommodation requests. The Court, therefore, will briefly review the record on this issue. On July 16, 2015, Plaintiff e-mailed an MTA human resources employee to request a reasonable accommodation for him and McConville, explaining that he "suffers from Crohn's Disease, and at times need[s] to use the restroom at work from it." Dkt. 60, Pl.'s Decl., Ex. A (Pl.'s July 16, 2015 E-mail); *see also* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 342:306. He did not receive a response until September 11, 2015, at which point the human resources employee sent Plaintiff a form to fill out to make a formal accommodation request. *See id.* at Tr. 344:8-15. Plaintiff admits that he "didn't submit that form." *Id.* at 344:14. Nor did he contact that employee (or anyone else at the MTA) about this request for nearly a year. *See* Dkt. 54, Witkin Decl., Ex. 1 at Tr. 347:13-25.

In July 2016, the arbitrator ordered that "[Plaintiff] be transferred by the Chief to a District from which his health problem may be more adequately accommodated." Dkt. 54, Witkin Decl., Ex. 9. As a result, Plaintiff was transferred to District 4, which he believes "was tantamount to denying [him] a reasonable accommodation, in that restrooms were not plentiful

35

and were not as available and accessible in District 4." Pl.'s Opp. at 29. In August 2016, the union filed a grievance on his behalf, claiming that his health problems were adequately taken care of in District 5 prior to his transfer. *See* Dkt. 54, Witkin Decl., Ex. 16. Approximately two months later, in November 2016, Plaintiff made his first formal accommodation request for a transfer to District 5. *See* Dkt. 60, Pl.'s Decl. ¶¶ 92-93. Defendant MTA processed this request quickly, conducting a medical review in December 2016 and formally granting the request on January 9, 2017. *See* Dkt. 54, Witkin Decl., Ex. 12-14.

Regarding Plaintiff's July 2015 accommodation request, no trier of fact could reasonably find that Defendant MTA unlawfully refused to make Plaintiff an accommodation. *See Natofsky*, 921 F.3d at 352. In response to Plaintiff's request, an MTA human resources employee directed him to make a formal request by filling out an attached form. Yet, after being provided with this form, Plaintiff failed to follow up. "The general rule . . . is that the initial burden of requesting an accommodation is on the employee and is only after such a request has been made that the employer must engage in the 'interactive process' of finding a suitable accommodation." *Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001) ("Courts have applied this general rule and dismissed ADA claims where the plaintiff has failed to prove that she requested an accommodation."); *see also Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) ("[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.").

In addition, although it took approximately two months for Plaintiff to get a response, that in itself is does not create a genuine dispute as to a material fact. *See, e.g.*, *Saunders v. Queensborough Cmty. Coll.*, No. 13-CV-5617 (PKC), 2015 WL 5655719, at *7 (E.D.N.Y. Sept. 24, 2015) (dismissing an accommodation claim despite a seven-month delay in responding to the

request because "[t]he length of the delay alone does not raise an inference of discriminatory intent under the circumstances of this case"). Rather, "[t]o prevail on a claim that a defendant failed to provide a reasonable accommodation in a timely manner, a plaintiff [must] prove that the failure was motivated by discriminatory intent." *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 421 (S.D.N.Y. 2018). Thus, even if the two-month delay in responding to Plaintiff's e-mail could be deemed unreasonable, Plaintiff has not shown that the delay was a result of discriminatory intent. *See Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999) (granting summary judgment because "plaintiff has adduced absolutely no evidence to show that plaintiff's three-week delay was motivated by an attempt to discriminate against plaintiff"). In other words, no reasonable trier of fact could conclude that Defendant MTA "refused to make such accommodations" in July 2015. *Natofsky*, 921 F.3d at 352.

There is also no basis for a trier of fact to find that Plaintiff's November 2016 accommodation request was unreasonably denied. After Plaintiff made a formal request on November 21, 2016, an MTA division reviewed it approximately two weeks later on December 9, preliminarily approving his transfer from District 4 to District 5. *See* Dkt. 54, Witkin Decl., Ex. 11, 12. That transfer was officially granted on January 9, 2017. *See* Dkt. 54, Witkin Decl., Ex. 14. Plaintiff's request to work the nightshift at District 5, which was initially denied for lack of documentation, was then granted in February 2017. *See Economou v. Caldera*, No. 99-CV-12117, 2000 WL 1844773, at *23 (S.D.N.Y. Dec. 18, 2000) (holding that it is reasonable for an "employer [to] require an employee to provide documentation"). Although generally "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder, . . . in a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment

37

if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Noll v. Int'l Bus. Mach. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). Here, there is no dispute that Defendant MTA did not "refuse[] to make such accommodations" that Plaintiff requested, and thus summary judgment is warranted.[24] *Natofsky*, 921 F.3d at 352.

## IV. Conspiracy Pursuant to 42 U.S.C. § 1985

Plaintiff asserts that Defendants were "actively engaged in a scheme and conspiracy designed and intended to deny and deprive plaintiff of rights guaranteed to him under the Constitution and laws of the United States in violation of 42 U.S.C. § 1985" and, as a result, he "experienced and continues to experience" among other things "humiliation, emotional distress, pain and suffering." Compl. ¶ 220.

To establish a conspiracy claim pursuant to § 1985, Plaintiff must show that there was "(1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). "A conspiracy 'need not be shown by proof of an explicit agreement,'" but then, at minimum, there must be a "showing that the 'parties ha[d] a tacit understanding to carry out the prohibited conduct.'" *Id.* (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995). Moreover, a remedy under § 1985 is available only "upon a causal link between the conduct complained of and animus or invidious discrimination that is based upon the plaintiff's membership in a protected class." *Pabon v. N.Y.C. Trans. Auth.*, 703 F. Supp. 2d 199,

---

[24] Plaintiff also seems to suggest that Defendants have violated the ADA by requiring him to request an extension of his accommodation every thirty days. Plaintiff cites no case law to support this, and "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll*, 787 F.3d at 95.

202 (S.D.N.Y. 2010).

Even after substantial discovery was exchanged, Plaintiff offers nothing more than conclusory allegations that a conspiracy existed between Defendants, let alone one predicated on Plaintiff's disability. Even assuming *arguendo* that there was a genuine dispute of material fact as to any of these elements, the intracorporate doctrine would still bar Plaintiff's claim. *See* Defs.' Memo. at 24-25. "Under the intracorporate conspiracy doctrine, employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring together." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 210 (S.D.N.Y. 2013); *see also Hermann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment."). Plaintiff brings this claim against Defendant MTA and the individual Defendants, who are all members, in different ranks, of the MTA Police Department. Because the individual Defendants are all employees of the same municipal entity the MTA, they thus cannot "conspire" against Plaintiff as understood by § 1985.

Plaintiff attempts to avoid application of the intracorporate doctrine by citing its exception for when individuals within a single entity "conspired outside the scope of their employment." *DeJesus v. City of New York*, 55 F. Supp. 3d 520, 526 (S.D.N.Y. 2014). According to Plaintiff, "he has offered sufficient evidence . . . that the individual defendants acted in self-interest and for person[al] reasons to retaliate against Plaintiff." Pl.'s Opp. at 19. But in making this assertion, Plaintiff points to nothing in the record for support. And the Court has independently not found any support for the assertion that the individual Defendants were acting in self-interest, let alone even in a retaliatory fashion. Rather, the alleged harassment all

pertained to core work issues, such as how to interpret the CBA's overtime provision and to what extent Plaintiff's supervisors can assign and monitor his patrol schedule. Thus, without alleging the involvement of another entity or that the individual Defendants were acting outside the scope of their employment, Defendants are entitled to summary judgment as to Plaintiff's conspiracy claim.

## V.      State & Municipal Claims

Plaintiff's claims also include alleged violations of the NYSHRL, NYCHRL and New York Civil Service Law § 75-b.  *See* Compl. ¶¶ 156-64, 182-89 (NYSHRL); *id.* ¶¶ 165-73, 190-97 (NYCHRL); *id.* ¶ 216-19 (N.Y. Civ. Serv. Law § 75-b).  Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  A district court, however, "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine   judicial economy, convenience, fairness, and comity   will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003).  Generally, "if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well."  *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (citation omitted).

Here, declining jurisdiction over Plaintiff's state and municipal claims would not disserve the principles of judicial economy, convenience, or fairness.  The Court has determined that Defendants are entitled to summary judgment on all of the federal claims.  Although the Court has analyzed Plaintiff's ADA claims, it "has not yet invested the resources necessary to resolve

the NYCHRL [and NYSHRL] claims, which require application of a different standard with which the state courts are more familiar." *Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 394 (S.D.N.Y. 2013). And while extensive discovery has taken place in this action, that work is equally applicable in state court. *See id.* ("The extensive discovery already taken is likely sufficient to enable Plaintiffs' NYCHRL claims to be evaluated in state court without any additional discovery."). Accordingly, the Court declines jurisdiction over Plaintiff's state and municipal claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.[25] The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 44 and close the case.

Dated:     March 18, 2020
           New York, New York

_____
Ronnie Abrams
United States District Judge

---

[25] Because the Court grants Defendants' motion for summary judgment as to all of the federal claims, it need not consider Plaintiff's request for punitive damages from the individual Defendants. *Cf.* Dkt. 41 (dismissing with prejudice the request for punitive damages against Defendant MTA). The Court nonetheless notes that Plaintiff would not be entitled to punitive damages because he sued the individual Defendants in their official capacities and "they enjoy the same immunity from punitive damages as the City." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir. 1997). Finally, "[e]ven if [Plaintiff] had sued those officials in their *individual* capacities, the record is devoid of evidence of the 'evil motive or intent' or 'callous indifference' that is essential to an award of punitive damages." *Id.*